IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

CORNELL POE,

       Plaintiff,

vs.                                No. 07-1016-B

CORRECTIONS CORPORATION OF
AMERICA, et al.,

       Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ORDER DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
ORDER OF DISMISSAL
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
NOTICE OF APPELLATE FILING FEE

---

On January 17, 2007, Plaintiff Cornell Poe, Tennessee Department of Correction ("TDOC") prisoner number 390512, who is currently an inmate at the Hardeman County Correctional Facility in Whiteville, Tennessee, filed a pro se complaint pursuant to, inter alia, 42 U.S.C. § 1983 in the United States District Court for the Middle District of Tennessee concerning his previous confinement at the Whiteville Correctional Facility ("WCF") in Whiteville, Tennessee. United States District Judge Todd J. Campbell issued an order on January 17, 2007 assessing the civil filing fee and transferring the case to this district, where it was docketed on January 26, 2007. Then-Chief United States District Judge James D. Todd issued an order on February 21, 2007 that, inter alia,

directed the Clerk to issue process for, and the marshal to effect service on, the Corrections Corporation of America ("CCA"); WCF Correctional Officer McCartney, and WCF Sergeant Sharika Michaels. (Docket Entry ("D.E.") 6.)[1] Defendants CCA and Michaels answered the complaint on April 30, 2007. (D.E. 16.)

On September 19, 2007, Defendants CCA and Michaels filed a motion for summary judgment, supported by a legal memorandum, a statement of undisputed facts, and the affidavits of WCF Warden Stephen Dotson and Sergeant Sharika Michaels. (D.E. 29.)[2] On January 24, 2008, Plaintiff filed a response to Defendants' motion that included a cross-motion for summary judgment (D.E. 48),[3] and Defendants responded to the cross-motion on February 8, 2008 (D.E. 51).[4] Included in Defendants' February 8, 2008 filing was the deposition of former inmate David Sullivan, who is also named as a defendant in this case.

---

[1]     The complaint also purported to sue David Sullivan, who was, at the relevant time, an inmate at the WCF. The order provided that service could not issue on Defendant Sullivan at that time because his TDOC number was unknown but that, if Plaintiff provided the TDOC number prior to the expiration of the limitations period, service would issue. (Id. at 3 n.2.) On July 20, 2007, the Clerk docketed a letter from Plaintiff that provided Sullivan's TDOC number and asked that service issue on him. (D.E. 25.) On October 18, 2007, Judge Todd directed the Clerk to issue process for, and the marshal to effect service on, Sullivan. (D.E. 31.) On December 21, 2007, the Clerk docketed a letter from Defendant Sullivan, which was deemed to be an answer to the complaint. (D.E. 39.)

[2]     Defendant McCartney was not served and, on June 26, 2008, the Court issued an order dismissing the complaint against her. (D.E. 65.)

[3]     The Court will exercise its discretion, in this instance only, to consider Plaintiff's untimely response.

[4]     In an order issued on July 7, 2007, the Court accepted Plaintiff's untimely cross-motion for summary judgment.

Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation omitted).

Under Fed. R. Civ. P. 56(e), "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986) (same).[5]

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>id.</u> at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"); <u>Matsushita</u>, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted). The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter, however. <u>Liberty Lobby</u>, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require

---

[5]     Rule 56(e) sets forth in detail the evidentiary requirements applicable to a summary judgment motion:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to all the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

Moreover, Fed. R. Civ. P. 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

"Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." Cacevic v. City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000); see also Good v. Ohio Edison Co., 149 F.3d 413, 422 (6th Cir. 1998); Plott v. General Motors Corp., 71 F.3d 1190, 1196-97 (6th Cir. 1995). Moreover, the Sixth Circuit has held that, unless the nonmoving party files a Rule 56(f) affidavit, a district court cannot decline to consider the merits of a summary judgment motion on the ground that it is premature. Wallin v. Norman, 317 F.3d 558, 564 (6th Cir. 2003).

The Court finds the following facts to be undisputed for purposes of this motion:[6]

---

[6]    The Court's task is complicated by Plaintiff's failure to comply with Local Rule 7.2(d)(3), which provides that "the opponent of a motion for summary judgment who disputes any of the material facts upon which the proponent has relied pursuant to subsection (2) above shall respond to the proponent's numbered designations, using the corresponding serial numbering, both in the response and by affixing to the response copies of the precise portions of the record relied upon to evidence the opponent's contention that the proponent's designated
(continued...)

1.    The Whiteville Correctional Facility ("WCF") is a
      correctional facility operated by Correction
      Corporation of America ("CCA"), and is located in
      Hardeman County, Tennessee. WCF houses male inmates
      in the custody of the Tennessee Department of
      Correction ("TDOC"). (Affidavit of Warden Stephen
      Dotson, sworn to on Sept. 19, 2007 ("Dotson Aff."),
      ¶ 3.)

2.    On October 8, 2006, Cornell Poe and David Sullivan,
      both of whom are inmates in the custody of the TDOC
      and housed at WCF, were involved in a physical
      altercation. (Compl., p. 8 (D.E. 5-3 at 8); Dotson
      Aff., ¶¶ 4-5;[7] Affidavit of Sergeant Sharika
      Michaels, sworn to on Sept. 19, 2007 ("Michaels
      Aff."), ¶ 3.)

3.    Prior to October 8, 2006, Inmate Poe had not
      advised Michaels, or any other WCF employee, that
      he believed that his health or safety was in danger
      from Inmate Sullivan or from any other inmates.
      Furthermore, Inmate Poe had not listed Inmate
      Sullivan as an incompatible inmate before the
      altercation, as required by TDOC policies and
      procedures. (Michaels Aff., ¶ 10; Dotson Aff., ¶¶
      6-7.)

4.    Sergeant Sharika Michaels, who is a correctional
      officer employed at WCF, was assigned to the
      housing unit where the altercation occurred on
      October 8, 2006. (Michaels Aff., ¶¶ 2-3.)[8]

---

[6]      (...continued)
material facts are at issue." Although Plaintiff submitted a statement of
disputed factual issues, his list does not track the list submitted by Defendants
and it does not attach portions of the record. Nonetheless, the Court has
attempted, by examining the complaint, which was sworn to under penalty of
perjury, to discern the extent to which Plaintiff is able to dispute the proposed
factual findings submitted by Defendants. In that regard, Plaintiff's verified
complaint is the functional equivalent of an affidavit. Smith v. Campbell, 250
F.3d 1032, 1036 (6th Cir. 2001); Weberg v. Franks, 229 F.3d 514, 526 n.14 (6th
Cir. 2000).

[7]      This statement in Warden Dotson's affidavit is apparently based on
the WCF's business records, as neither he nor any of the parties to this case
have stated that Dotson was present when the incident occurred. Later in his
affidavit, Warden Dotson states that "I have reviewed the incident report."
(Dotson Aff., ¶ 8.)

[8]      Defendants' proposed factual finding no. 5 is omitted, because there
are disputes that need to be addressed.

6.    Although there were other inmates standing near
      Inmates Poe and Sullivan during the altercation,
      Inmates Poe and Sullivan were the only inmates
      involved in the fight. (Michaels Aff., ¶ 5.)[9]

7.    After Inmates Sullivan and Poe were separated, they
      were both removed by correctional officers from the
      housing unit and escorted to WCF's medical unit for
      physical examination. (Michaels Aff., ¶ 7.)

8.    At 5:57 p.m., Inmate Poe entered the WCF medical
      unit. WCF medical staff examined Inmate Poe, and he
      informed the medical staff that he was unable to
      see out of his left eye and that his mouth was
      hurting. Upon examination, WCF medical noted that
      his left eye was bleeding, there was a knot on his
      head, and that his lip was swollen. The medical
      staff examined Inmate Poe at approximately 6:10
      p.m. The medical staff referred Inmate Poe to the
      Bolivar General Hospital for further evaluation.
      (Michaels Aff., ¶¶ 7-9; Dotson Aff., ¶ 9.)[10]

9.    WCF staff transported Inmate Poe to the Bolivar
      General Hospital shortly after he was evaluated by
      the WCF medical staff. The Bolivar General Hospital

---

[9]    The complaint alleges that 10-15 other inmates "encircled" Plaintiff,
but there is no allegation that any person other than Sullivan assaulted him.
(D.E. 5-3 at 8.) Plaintiff's response to the summary judgment motion is not sworn
to under penalty of perjury and, therefore, cannot be considered as evidence.
That document states that Plaintiff had a prolonged verbal confrontation with
Sullivan and his friends, but there is no allegation that anyone other than
Sullivan assaulted him. (D.E. 48 at 1-2.) In his deposition, Inmate Sullivan
stated that a total of three other inmates were with him during the incident in
question. (D.E. 51-2 at 21.)

[10]    In his complaint, Plaintiff alleges he was made to wait at the WCF
medical department for several hours before receiving treatment. (D.E. 5-3 at 9.)
According to the clinic log, Defendant Michaels and others entered the medical
department with Plaintiff (who is identified by his TDOC number) at 5:57 p.m.
(D.E. 29-2 at 4.) Defendant Michaels left at 6:30 p.m. (id. at 5), and she states
in her affidavit that she was in the medical unit while Plaintiff was examined
(Michaels Aff., ¶ 7). At 7:00 p.m. C/O Sanders entered the medical unit to escort
Poe to Bolivar General Hospital. Poe left the medical unit with two corrections
officers at 7:10 p.m. (D.E. 29-2 at 5.) In his response to the summary judgment
motion, which was not sworn to under penalty of perjury, Plaintiff states that
he was taken to the hospital at approximately 7:30 p.m. (D.E. 48 at 2.) Even if
Plaintiff's unsworn assertions are credited, Plaintiff spent a total of
approximately 90 minutes at the WCF medical unit, during which time he was
examined by a staff member, who decided his injury was severe enough to transport
him to an outside hospital. During that time, according to Plaintiff's version
of events, gauze and an ice pack were applied to his eye and transportation to
the hospital was arranged. (Id.)

admission and emergency room records indicate that
Inmate Poe was admitted to the hospital at 8:00
p.m. on October 8, 2006. (Dotson Aff., ¶ 10; D.E.
29-4 at 3 (records of Bolivar General Hospital).)

10. After being examined and receiving treatment at the
Bolivar General Hospital, Inmate Poe was referred
by the hospital staff to Nashville Metro Hospital
for further treatment. WCF employees transported
Inmate Poe to Nashville Metro Hospital. (Dotson
Aff., ¶ 11; D.E. 29-4 at 3-6, 15-17.)

11. After WCF staff transported Inmate Poe to Nashville
Metro Hospital, the TDOC assumed custody of Inmate
Poe. Inmate Poe has not been housed at WCF since he
left the facility on October 8, 2006. (Dotson Aff.,
¶ 12.)

The Eighth Amendment prohibits cruel and unusual
punishment. See generally Wilson v. Seiter, 501 U.S. 294 (1991). An
Eighth Amendment claim consists of both objective and subjective
components. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Hudson v.
McMillian, 503 U.S. 1, 8 (1992); Wilson, 501 U.S. at 298; Brooks v.
Celeste, 39 F.3d 125, 127-28 (6th Cir. 1994); Hunt v. Reynolds, 974
F.2d 734, 735 (6th Cir. 1992). The objective component requires
that the deprivation be "sufficiently serious." Farmer, 511 U.S. at
834; Hudson, 503 U.S. at 8; Wilson, 501 U.S. at 298. The subjective
component requires that the official act with the requisite intent,
that is, that he have a "sufficiently culpable state of mind."
Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 297, 302-03.

"'[P]rison officials have a duty . . . to protect
prisoners from violence at the hands of other prisoners.'" Leary v.
Livingston County, 528 F.3d 438, 442 (6th Cir. 2008) (quoting
Farmer, 511 U.S. at 833); see also Dellis v. Corrections Corp. of
Am., 257 F.3d 508, 512 (6th Cir. 2001). To establish liability

under the Eighth Amendment for a claim based on failure to prevent harm to a prisoner, a plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the prisoner would suffer serious harm. Farmer, 511 U.S. at 834; Helling v. McKinney, 509 U.S. 25, 32 (1993); Woods v. Lecureux, 110 F.3d 1215, 1222 (6th Cir. 1997); Street v. Corrections Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996); Taylor v. Michigan Dep't of Corrections, 69 F.3d 76, 79 (6th Cir. 1995). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. Thus,

> [a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Eighth Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Id. at 837-38 (emphasis added; citations omitted); see also Garretson v. City of Madison Heights, 407 F.3d 789, 796 (6th Cir. 2005) ("If the officers failed to act in the face of an obvious risk of which they should have known but did not, then they did not violate the Fourteenth Amendment."). To show that a corrections

officer was deliberately indifferent to the risk that an inmate would be assaulted by another inmate, there must be a showing that the assault was "reasonably preventable." Dellis, 257 F.3d at 512 (citing Babcock v. White, 102 F.3d 267, 272 (7th Cir. 1996)).

In this case, Plaintiff has not come forward with sufficient evidence to raise a triable issue of fact as to whether Defendant Michaels was deliberately indifferent to the risk that Inmate Sullivan would assault Plaintiff. It is undisputed that, prior to October 8, 2006, Plaintiff had not advised WCF staff that his health or safety were threatened by Sullivan or any other inmate and he had not listed Sullivan as an incompatible. Factual Finding ("FF") 3. Thus, prior to the incident at issue, WCF staff had no reason to be concerned that Sullivan might attack Plaintiff.[11]

Although "warnings from the prisoner himself are not required when other evidence discloses a substantial risk of serious harm," Woods, 110 F.3d at 1224, Poe has not come forward

_____

[11]    Plaintiff has not specifically countered this evidence. In his complaint, he asserts that Sullivan was a member of the Aryan Nation gang (D.E. 5-3 at 8), and the WCF incident report supports that assertion (D.E. 55-2 at 25; see also D.E. 51-2 at 13 (deposition of David Sullivan)). Sullivan testified that "this whole Aryan Nation thing, you know, it's—it's a tag. It's a label. I carry it with me. I'm a big, white guy with a bald head and a bunch of tattoos." (D.E. 51-2 at 39-40.) Sullivan also testified that, prior to October 8, 2006, he had had no interaction with Plaintiff other than "see[ing him on the ball field, working out and stuff. That's it." (Id. at 17; see also id. at 18 ("I wouldn't have known him from Adam."), 34-36.) He also stated that "I didn't even know who the hell Cornell Poe was until I got the write-up for fighting him. I couldn't have told you his name or—I couldn't even tell you what cell he lived in, you know, even though he lived in my housing unit. But that's how much attention I paid to Cornell Poe. He was nothing to me." (Id. at 35.) Plaintiff has come forward with no evidence of prior interactions with Sullivan, or Sullivan's history of violence in general, sufficient to raise a triable issue that Defendant Michaels or any other WCF employee should have known, before the incident, that Sullivan posed a potential threat to Plaintiff.

with other evidence that Sullivan posed a risk to him, or that Michaels (or any other CCA employee) was aware of, and disregarded, pervasive violence at the WCF, Hester v. Morgan, 52 F. App'x 220, 223 (6th Cir. 2002); Woods, 110 F.3d at 1225 ("Although Jabe does not deny that SPSM housed violent prisoners and that violence among the prison population would sometimes occur, this fact does not establish an Eighth Amendment violation."). "There is no evidence that the risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.'" Hester, 52 F. App'x at 223 (quoting Street, 102 F.3d at 105). There is no proof in the record of the incidence of gang or racial violence, or even of any previous inmate on inmate assaults at the WCF.

Even if Defendant Michaels lacked prior knowledge of a threat posed by Sullivan, she can be held liable for failing to respond appropriately once the fight broke out. Plaintiff and Defendants have provided somewhat different accounts of the events at issue. In his verified complaint, Poe alleges that Sullivan and ten or fifteen other gang members "encircled" him. (D.E. 5-3 at 8.) The complaint asserts that "Officer McCartney was in [the] pod at the beginning of [the] confrontation, before [the] assault and battery ever transpired. She abandon[ed] the pod area and in the sally port hallway she told Sgt. Michaels, 'I wouldn't go in their [sic], they are fighting!'" (Id. at 9.) In his response to the summary judgment motion, which is not sworn to under penalty of perjury, Plaintiff contended that he and Sullivan had a "verbal

confrontation" "for 15 to 30 mins. when all of a sudden inmate Sullivan stabbed Plaintiff (Poe) in the left eye." (D.E. 48 at 2.) He complained that Officers McCartney (who is referred to as "McCurley" in this filing) and Parham, who were present in the pod, "didn't make a move to help Plaintiff Poe or call for assistance." (Id.)[12] Under Plaintiff's version of events, then, it appears that Michaels was not in the pod when the altercation first broke out.

Michaels submitted an affidavit in which she stated as follows:

> 3. On October 8, 2006, I was posted at the PC pod at WCF. At approximately 5:45 p.m., I observed Inmate Cornell Poe and Inmate David Sullivan suddenly begin to fight while both were in the dayroom of FC pod.
>
> 4. Upon observing the fight break out, which was sudden and occurred without warning, I gave both inmates verbal directives to stop fighting. I immediately radioed for assistance and to inform staff of the situation.
>
> 5. Although there were other inmates standing near Inmates Poe and Sullivan during the altercation, Inmates Poe and Sullivan were the only inmates involved in the fight.
>
> 6. I continued to give verbal directives for the inmates to stop fighting and additional WCF staff arrived within moments to assist in separating the inmates. I did not attempt to separate the inmates without assistance because of the risk to my safety and the risk to the safety of other staff and to inmates that would have existed if a lone corrections officer entered into a common area where the general population of the FC pod had access. Furthermore, requesting assistance to break up a fight is a WCF policy and procedure.

---

[12]     Poe's medical records make clear he was not stabbed in the eye; instead, he sustained blunt trauma to the eye (D.E. 29-4 at 3, 5) which shattered his cornea (id. at 5). Plaintiff must have assumed he was "stabbed" because of the pain he experienced.

(Michaels Aff., ¶¶ 3-6.) Michaels does not state when she first entered the pod, and she also does not address what caused Plaintiff and Sullivan to fight, other than to state that the altercation "was sudden and occurred without warning." This version of events suggests either there was no argument between the inmates before blows were struck or that Michaels entered the pod after the argument and immediately prior to the assault.

In his deposition, Sullivan asserted that the confrontation was precipitated when Plaintiff was walking in circles around the pod and twice intentionally bumped into a friend of Sullivan's. (D.E. 51-2 at 18-21.)[13] Sullivan testified that, after the second time Poe bumped into his friend,

> I had enough, you know. And I told him I said, hey, look, man, I said, there's—you know, next time—you know, if you're going to be so disrespectful, you might want to say excuse me or something.
>
> I don't remember exactly what was said, but he said something to the effect of—you know, or told me to go fuck myself. Okay?
>
> Well, that, you know, of course, irritated me a little bit. So we got a little closer in this confrontation, face-to-face, and he said something to me that I found threatening.
>
> Like I said, I don't remember exactly what was said, but something to the effect, you know, fuck you. What are you going to do? Blah, blah, blah, you know, that kind of, you know, wolfing-type thing. And he took a step toward me, and I hit him, and that was it. We started fighting.

---

[13]    In his unsworn response to the summary judgment motion, Plaintiff asserted that he was "power walking" around the pod when Sullivan and his "brothers" "began to ask me questions and tell me they were going to kill me." (D.E. 48 at 1-2.) Plaintiff does not mention bumping into any inmate.

(Id. at 21-22; see also id. at 22-24.)[14]

In Sullivan's version of events, Michaels was not present at the beginning of the confrontation. He described Michaels' role as follows:

> Ms. Michaels, she was the first one there. I guess the booth had called, you know, the code over the radio or whatever.
>
> CCO Michaels came in the door. She told us to stop fighting. You know, of course, in the heat of the moment, you know, neither one of us were really paying her much attention. She yelled lock down.
>
> Everybody was locked down except for us. We continued fighting. And then once he hit the ground—she was by herself, actually. When she came in the pod, she was by herself. Had no back-up, no one else with her. She stayed there in the doorway and yelled at us to break it up and yelled lock down for everybody to get locked down.
>
> Once everybody was locked down—and then, like I said, once Cornell went down to one knee, I walked away from him with my hands in the air, just, you know, surrender—I didn't—he was done. I was done. But I wasn't getting—you know, I didn't want to kill the guy. I was just, you know, in my eyes, defending myself, walked away. The other officers came in, they handcuffed me and took me out of there, put me in a hole, and him to medical.
>
> Q. About how long to the best of your recollection—about how much time passed from when Ms. Michaels came into the pod doorway, told you to stop, until back-up came in?
>
> A. Ten, 20 seconds.
>
> Q. Did you say anything to Ms. Michaels during that time?
>
> A. No. Nothing whatsoever.
>
> Q. Did Mr. Poe say anything to her?

---

[14] Sullivan confirmed that a total of three other inmates were with him during the incident. (Id. at 21.)

A.    Nothing whatsoever, no.

(D.E. 51-2 at 26-27.)

Plaintiff has not come forward with evidence sufficient
to raise a triable issue of fact as to whether Michaels was
deliberately indifferent to the risk posed to his health or safety
by Sullivan. It is undisputed that, before the assault, Michaels
had no information that Sullivan posed any particular risk to
Plaintiff. There is no proof in the record that Michaels was aware
of any protracted argument between Plaintiff and Sullivan prior to
the assault. Under Plaintiff's version of events, Michaels was not
present in the pod until after he and Sullivan began to fight. Poe
also asserted, in his unsworn response to the summary judgment
motion, that the injury to his eye occurred as a result of the
first blow by Sullivan, which happened "all of a sudden." (D.E. 48
at 2.) Plaintiff does not argue that there was any action Michaels
could have taken that could have prevented his injury. Therefore,
the Court GRANTS Michaels' motion for summary judgment. As no other
claims are asserted against this Defendant, the complaint is
DISMISSED as to her.[15]

Poe has also asserted a failure to protect claim against
CCA because of the assault by Sullivan. "A private corporation that
performs the traditional state function of operating a prison acts
under color of state law for purposes of § 1983." Thomas v. Coble,
55 F. App'x 748, 748 (6th Cir. 2003) (citing Street v. Corrections

---

[15]    Plaintiff's allegation that he received inadequate medical care for
his injury is not directed at Defendant Michaels.

15

Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996)). The dismissal of the failure to protect claim against Michaels does not mandate dismissal of the same assertion against CCA, as Plaintiff has alleged in his verified complaint that the corrections officers who were present in the pod did not intervene when the fight broke out. See supra pp. 11-12.

Even if it was proven that some CCA employee, not named a party to this action, was deliberately indifferent to the risk posed on Poe by Sullivan, it does not follow that CCA can be held liable to Plaintiff. There is no respondeat superior liability under § 1983. A local governmental entity "is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer." Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992); see also Jett v. Dallas Indep. School Dist., 491 U.S. 701, 726-29 (1989) (discussing history of civil rights statutes and concluding that Congress plainly did not intend to impose vicarious liability on counties, municipalities or other local governmental bodies); City of Canton v. Harris, 489 U.S. 378, 388 (1989) (rejecting simple vicarious liability for municipalities under § 1983); City of St. Louis v. Praprotnik, 458 U.S. 112, 122 (1988) (interpreting rejection of respondeat superior liability by Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978), as a command that "local governments . . . should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights"); Pembaur v. City of

*Cincinnati*, 475 U.S. 469, 480-81 (1986) (same); <u>Stemler v. City of Florence</u>, 126 F.3d 856, 865 (6th Cir. 1997) (rejecting claims against city and county and holding that "in order to state a claim against a city or a county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional 'policy' or 'custom' of the municipality"). To establish municipal liability, a plaintiff must demonstrate

> (1) that the City pursued an official custom or policy of failing to adequately train, supervise, or discipline its officers in a particular matter, and (2) that such official policy or custom was adopted by the official makers of policy with "deliberate indifference" towards the constitutional rights of persons affected by the policy or custom.

<u>Haverstick v. Financial Fed. Credit, Inc.</u>, 32 F.3d 989, 996 n.8 (6th Cir. 1994) (citing <u>City of Canton</u>, 489 U.S. at 387-88). Thus, "'a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy."'" <u>Searcy v. City of Dayton</u>, 38 F.3d 282, 287 (6th Cir. 1994) (citations omitted). The Sixth Circuit has applied this standard to claims against private corporations that operate prisons. <u>Thomas v. Coble</u>, 55 F. App'x at 748-49; <u>Street</u>, 102 F.3d at 817-18; <u>Johnson v. Corrections Corp. of Am.</u>, 26 F. App'x 386, 388 (6th Cir. 2001).

In his verified complaint, Plaintiff alleged that, once the fight broke out, Officer McCartney (or McCurley) abandoned the pod. <u>See</u> <u>supra</u> p. 11. He also asserted that, on her way out of the pod, McCartney (or McCurley) advised Michaels against entering the pod. <u>Id.</u> It is undisputed that Michaels disregarded that advice. In

17

her affidavit, Michaels states that she gave the inmates verbal directions to stop fighting and radioed for assistance. Michaels Aff., ¶ 4. She explained that "WCF policy" precluded an individual corrections officer from attempting to break up a fight and, instead, required that she call for assistance. Id., ¶ 6. Within moments, according to the testimony of Sullivan, additional officers came into the pod and broke up the fight. (D.E. 51-2 at 27; see also Michaels Aff., ¶¶ 6-7.)

Poe has not identified an unconstitutional policy or custom that is responsible for his injury. Sullivan's first blow caused the injury to Plaintiff's eye, and that occurred prior to Officer McCartney (or McCurley) leaving the pod. Even if it is assumed that Officer McCartney (or McCurley) abandoned the pod, as Plaintiff alleges, there is no proof that that action was consistent with CCA policy or custom or that Plaintiff's injury could reasonably have been avoided if only that officer had remained at the scene.[16]

The Court GRANTS CCA's motion for summary judgment on the failure to protect claim.

The complaint also asserts an Eighth Amendment claim against CCA on the theory that it was deliberately indifferent to

_____

[16] In his response to the summary judgment motion, Plaintiff suggests that CCA is responsible for "hid[ing]" Officer McCartney (or McCurley). (D.E. 48 at 4.) Plaintiff's failure properly to identify this officer so she could be served prior to the expiration of the statue of limitations has been addressed in previous orders and will not be revisited here. Suffice it to say that there has been no proof that CCA thwarted Plaintiff's efforts to identify, or serve, this officer. Moreover, the allegation makes little sense, as CCA could be held liable if this officer acted pursuant to an unconstitutional policy or custom even if the officer herself were not a party to the case.

18

the Plaintiff's serious medical need. "The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishments Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment." Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005). "A prisoner's right to adequate medical care `is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs.'" Id. at 874 (quoting Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001)); see also Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004) (quoting Estelle v. McGuire, 429 U.S. 97, 104 (1976)) ("The Eighth Amendment forbids prison officials from `unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs. . . . Prison officials' deliberate indifference violates these rights `[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care . . . ' for a serious medical need."). "Although the right to adequate medical care does not encompass the right to be diagnosed correctly, [the Sixth Circuit] has 'long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.'" Johnson, 398 F.3d at 874 (quoting Danese v. Asman, 875 F.2d 1239, 1244 (6th Cir. 1989)).

In this case, there can be no question that the injury to Plaintiff's eye constituted a serious medical need. "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would readily recognize the necessity for a doctor's attention.'" Blackmore, 390 F.3d at 897 (emphasis in original); see also Johnson, 398 F.3d at 874.

Plaintiff has not demonstrated that there is a triable issue of fact as to whether any CCA employee was deliberately indifferent to his serious medical need. Plaintiff entered the WCF medical unit at 5:57 p.m. FF 8. By 6:10 p.m., he had been examined by a nurse, who noted his injuries and decided that he needed to be sent to the Bolivar General Hospital for evaluation. Id. While still at the WCF medical department, under Plaintiff's unsworn version of events, gauze and an ice pack were applied to his eye. (D.E. 48 at 2.) Poe and two corrections officers left the WCF at 7:10 p.m. (see supra p. 7 n.10), and he arrived at the Bolivar General Hospital at 8:00 p.m. FF 9. Thus, Plaintiff cannot establish that there was any delay in treatment, or that any CCA employee acted with deliberate indifference to his medical needs or to the pain he may have experienced while awaiting treatment. Coopshaw v. Lenawee County Sheriff's Office, No. 05-72569, 2006 WL 3298898, at *3-*4 (E.D. Mich. Nov. 14, 2006).

Thus, the Court GRANTS Defendant's motion for summary judgment on the medical care claim.

As previously noted, see supra p. 2, Plaintiff's response to the summary judgment motion, which was filed on January 24, 2008, included his own cross-motion for summary judgment. (D.E. 48.) Although Plaintiff included his own statement of undisputed material facts (D.E. 48-2), he did not "affix to the memorandum copies of the precise portions of the record relied upon as evidence of each material fact," as required by Local Rule 7.2(d)(2). As the Court has concluded that Plaintiff has not come forward with evidence sufficient to create a factual dispute about the substance of his Eighth Amendment claims, it necessarily follows that he is not entitled to summary judgment on those claims. Plaintiff's motion for summary judgment is DENIED.

As summary judgment has been granted to Defendants Michaels and CCA, the complaint is DISMISSED WITH PREJUDICE as to those parties. As the complaint does not allege a viable federal claim, the Court declines to retain supplemental jurisdiction over the state-law assault claim against Sullivan. 28 U.S.C. § 1367(c)(3). That claim is DISMISSED WITHOUT PREJUDICE to Plaintiff's right to refile it in state court. All other pending motions are DENIED as moot. The Clerk is directed to enter judgment for Defendants.

Twenty-eight U.S.C. § 1915(a)(3) provides that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith. The good faith standard is an objective one. Coppedge v. United States, 369 U.S. 438, 445 (1962). An appeal is not taken in good faith if the issue presented

is frivolous. <u>Id.</u> The same considerations that lead the Court to dismiss this case also compel the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith and he may not proceed on appeal <u>in</u> <u>forma</u> <u>pauperis</u>.

The final matter to be addressed is the assessment of a filing fee if Plaintiff appeals the dismissal of this case. In <u>McGore v. Wrigglesworth</u>, 114 F.3d 601, 610-11 (6th Cir. 1997), the Sixth Circuit set out specific procedures for implementing the PLRA. Therefore, Poe is instructed that, if he wishes to take advantage of the installment procedures for paying the appellate filing fee, he must comply with the procedures set out in <u>McGore</u> and 28 U.S.C. § 1915(b).

IT IS SO ORDERED this 29th day of July, 2008.

<u>s/ J. DANIEL BREEN</u>
UNITED STATES DISTRICT JUDGE